RICHARD A. LANNON and CECILIA D. LANNON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lannon v. Commissioner
Docket No. 2731-74.
United States Tax Court
T.C. Memo 1976-346; 1976 Tax Ct. Memo LEXIS 56; 35 T.C.M. (CCH) 1585; T.C.M. (RIA) 760346; November 15, 1976, Filed Cecilia D. Lannon, pro se. Michael R. McMahon, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined a deficiency in the amount of $937.13 in petitioners' Federal income tax for 1970. The issues for decision are as follows: 1. Whether payments received by petitioner Richard A. Lannon from Langley Porter *57 Neuropsychiatric Institute in 1970 were compensation for services or a nontaxable scholarship or fellowship grant under section 117(a)(1). [1]/ 2. Whether the statutory notice of deficiency issued to petitioners was legally sufficient to support the jurisdiction of this Court to redetermine the income tax deficiency here in controversy. FINDINGS OF FACT At the time their petition was filed, petitioners Richard A. Lannon and Cecilia D. Lannon, husband and wife, were legal residents of Greenbrae, California. They filed a joint Federal income tax return for 1970 with the Internal Revenue Service Center, Fresno, California. Since the issue to be decided involves the taxability of payments received by Richard A. Lannon, he will be referred to herein as "petitioner." In June 1968, petitioner was graduated with a Doctor of Medicine degree from the University of California in San Francisco. In June 1969, he completed his internship at San Francisco General Hospital in that city. On August 29, 1968, petitioner received a letter *58 from the chairman of the residency selection committee at the Langley Porter Neuropsychiatric Institute (hereinafter institute) of the California Department of Mental Hygiene, offering him an appointment in the institute's psychiatric residency training program effective July 1, 1969. The letter stated, in part, as follows: You are being offered a position in the Department of Mental Hygiene Four - or Five - Year Program. As you know, the four-year program involves three years of residency training and one year of subsequent obligated service in the Department of Mental Hygiene. The five- year program involves three years of residency training and two years of obligated service. The salary scale for the four- and five-year plans is as follows: Four-year Plan
Five-year Plan
1st year
746.00/mo.
1100.00/mo.
2nd year
783.00/mo.
1155.00/mo.
3rd year
821.00/mo.
1213.00/mo.
You may choose either one depending upon which is more suitable and appropriate for your individual needs and preference. The three years of training are identical in both. The only difference is whether you are obligated for one or two years of subsequent service with the Department *59 of Mental Hygiene. The institute is operated jointly by the University of California and the Department of Mental Hygiene. Its professional staff consists of physicians, who also hold appointments in the Department of Mental Hygiene and on the University of California faculty, resident physicians, and interns. During 1970, the institute had about 15 resident physicians on its staff. The institute has a capacity of 105 beds and offers ambulatory services to about 1,500 patients each year. All admissions are voluntary. The institute is not dependent financially upon patient fees but receives support through annual appropriations of the State Legislature and has other resources. Its work includes research, training, and patient care. The institute's residency program is designed, in part, to help meet the needs of the State hospitals and other institutions for trained psychiatrists. Pursuant to the letter dated August 29, 1968, petitioner selected the 4-year plan and signed a contract in which he agreed to the following pertinent provisions: 1.That I will undertake 4 years of residency training [2/] at Langley Porter Neuropsychiatric Institute or in other affiliated *60 or approved facilities as required to complete the program. 2. That, in addition to the training years, I will complete 1 service year/s in a State Hospital or other facility approved by the Department of Mental Hygiene in a staff capacity of a Psych. Res or Staff Psychiatrist. (Psych.Res., Range C, or Staff Psychiatrist) * * *
4. That, if I change from the 4 (5 or 4) year plan to a (4 or 3) year plan, I will reimburse Langley Porter Neuropsychiatric Institute for the difference between the salary I have received and the salary I would have received in the 3 (4 or 3) year plan for the period I have been in the 4 (5 or 4) year plan, and also complete the appropriate service obligation. Reimbursement is to be commenced upon change of plans and will be completed prior to the conclusion of my obligated service. 5. That, while full consideration will be given to *61 my preferences, the needs of the Department, the availability of openings, and the interests of the appointing authority will generally determine where I will complete my service obligation. * * *
9. That, if without mutual agreement or the express approval of the Department of Mental Hygiene, I fail to complete the required number of service years, inasmuch as the amount of damages on breach of the agreement would be difficult to ascertain, it is hereby agreed that I shall be obligated to pay the California Department of Mental Hygiene, not as a penalty, but as agreed, liquidated damages in an amount equal to one half of the average monthly salary received during my training years for each month for which I fail to perform the obligated service assumed under this Agreement. Amounts due me representing accrued leave and retirement deductions may first be applied to my indebtedness. The balance of my indebtedness shall be paid in monthly installments in a period not to exceed two years from the date of the abrogation of the contract. This does not preclude earlier settlement of the outstanding balance. Under this agreement, petitioner was to, and did, serve the institute *62 as a full-time resident physician from July 1969 to June 1972. Petitioner spent about one-half of his time attending lectures and doing research. The other half of his time was devoted to working with patients, interviewing them and their family members, performing physical, psychiatric, and neurological examinations, prescribing needed drugs, and providing other treatment. His responsibilities for the care of patients gradually increased during his stay at the institute. Petitioner had regular hours of duty at the institute and he worked overtime whenever the needs of his patients dictated. Petitioner had on-call duty one night a month and was obligated to have another doctor cover for him if he could not be on duty. During 1970, petitioner received a salary of $9,796 from the institute as a resident in psychiatry. The amount of his salary was not determined by his financial needs but by the terms of his contract with the institute. The State of California withheld Federal income and Federal Insurance Contributions Act taxes from petitioner's salary. The institute gave him sick leave and 2 weeks vacation and provided him with malpractice and health insurance, laundry service, *63 and uniforms. Under his agreement with the institute, petitioner was obligated, upon completion of 3 years as a resident physician, to perform an additional year of service with the California Department of Mental Hygiene, but he notified the institute he did not wish to do so. Upon completion of his 3-year residency program, petitioner declined to accept an assignment to work at Metropolitan State Hospital or on a special project in the Los Angeles County Department of Mental Health. After he indicated his refusal to accept either assignment, an official in the Department of Mental Hygiene sent petitioner a letter, dated June 19, 1972, stating, in pertinent part: I would like to encourage you to reconsider your position if you can. There is a great need for your skills in a public service capacity and I feel sure you could make a real contribution during the years service you owe. Metropolitan State Hospital is in great need of psychiatrists and in the Los Angeles County special project, there is opportunity to bring your training to immediate application on a large public mental health service problem in that populous area. If, for your own reasons, you cannot see your *64 way clear to do this and have indeed decided to buy out, then the following procedure would be followed. Under the terms of your contract, on the four-year plan, you would owe the State, in lieu of service, approximately $5,184. An account receivable would be set up for you here at Headquarters and you would be expected to pay the sum due in the next two years. If that appears to be onerous, a proposal by you could be considered. Petitioner did not perform the additional year of service but entered private practice in 1972. In their income tax return for 1970, petitioners claimed a $3,600 exclusion from gross income for a fellowship stipend from the institute. On November 14, 1973, the District Director sent a communication to petitioners advising them of the disallowance of the gross income exclusion they had claimed, stating in part: The scholarship/fellowship exclusion which you have claimed is covered by Section 117 of the Internal Revenue Code. Income Tax Regulations Section 1.117-4 specify that amounts received as compensation for past, present or future employment services are not considered as scholarship of [sic] fellowship grants. On *65 this basis, the deduction has been disallowed. The statutory notice of deficiency, issued February 6, 1974, gives the following reason for the disallowance of the claimed exclusion from gross income: The monies paid to psychiatric residents employed at state hospitals represents compensation for services performed. Therefore, no exclusion from gross income as a fellowship or scholarship is allowable under Sec. 117. OPINION Section 117(a) excludes from gross income any amount received "as a scholarship at an educational institution" or "as a fellowship grant." Section 117(b)(2)(B) limits the amount of the exclusion available to nondegree candidates "to an amount equal to $300 times the number of months for which the recipient received amounts under the scholarship or fellowship grant" during the taxable year. The statute does not define the terms "scholarship" and "fellowship grant" but section 1.117-4(c), Income Tax Regs., which is as follows, provides that certain described payments do not qualify as such: Sec. 1.117-4 Items not considered as scholarships or fellowship grants. The following payments or allowances shall not be considered to be amounts received as a *66 scholarship or a fellowship grant for the purpose of section 117: * * *
(c) Amounts paid as compensation for services or primarily for the benefit of the grantor. (1) Except as provided in paragraph (a) of section 1.117-2, [3/] any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor. * * *
The validity of this regulation was upheld by the Supreme Court in Bingler v. Johnson,394 U.S. 741, 749-750 (1969). The Court explained (at page 751) that the terms "scholarships" and "fellowships" are ordinarily understood to refer to relatively disinterested, "nostrings" educational grants "with no requirement of any substantial quid pro quo from the recipients." Those terms do not include (394 U.S. at 757) "bargained-for payments, given only as a 'quo' in return *67 for the quid of services rendered--whether past, present, or future." See Frederick Fisher,56 T.C. 1201, 1211 (1971); JerryS. Turem,54 T.C. 1494, 1505 (1970). Apart from the daily services required of petitioner in caring for patients--interviewing them and their family members, taking their medical histories, prescribing drugs, developing and administering treatment plans, etc.-- petitioner was paid designated amounts treated as a salary on the express understanding that, upon completion of his residency work, he would serve one additional year in an institution designated by the Department of Mental Hygiene. Thus, the salary he received in 1970 was compensation for future as well as current employment services within the meaning of the foregoing regulations. The fact that he reneged on this agreement and refused to take the one-year assignment he was given under his contract does not convert his 1970 salary payments into a fellowship grant. The evidence that his 1970 salary was compensation for current and future services is overwhelming. An official of the Department of Mental Hygiene testified that one of the purposes of the institute's *68 residency program was to provide trained psychiatrists for State hospitals and community mental health programs. The August 29, 1968, letter offering petitioner an appointment to the residency position plainly stated that the "four-year program involves three years of residency training and one year of subsequent obligated service in the Department of Mental Hygiene." The letter specified a "salary scale" for the first three years, which was not based on financial need but which increased each year as petitioner gained experience. See Aloysius J. Proskey,51 T.C. 918, 924 (1969); cf. Robert Henry Steiman,56 T.C. 1350, 1355 (1971). The contract which petitioner signed expressly obligated him to complete one year of service in "a State Hospital or other facility approved by the Department of Mental Hygiene." Furthermore, the Department of Mental Hygiene treated petitioner as an employee--withholding taxes from his salary, giving him sick leave and a 2-week vacation, and providing him with malpractice and health insurance.Such treatment of the salary and provisions of fringe benefits, while alone not decisive, are usually part of a compensation *69 arrangement. See Irwin S. Anderson,54 T.C. 1547, 1552 (1970). We find no evidence supporting petitioner's claim that his salary payments from the institute were a scholarship or fellowship grant. On the contrary, such payment s had the characteristics of compensation for current and future services within the meaning of section 1.117-4(c), Income Tax Regs.
Petitioners make a variety of constitutional arguments. We understand petitioners' main contention to be that the Internal Revenue Service failed to advise them of the statute on which it relied to deny the claimed exclusion from gross income, and, consequently, the subsequently issued notice of deficiency is a nullity and the Court is without jurisdiction. This is a highly technical point since petitioners themselves claimed the exclusion in their return and, presumably, had knowledge of section 117, which allows fellowship grant exclusions. In any event, an Internal Revenue Service communication, dated November 14, 1973, referred to in our findings, explained that the claimed exclusion was not allowable under section 117 and section 1.117-4, Income Tax Regs. Further, the notice of deficiency, dated February 6, 1974, states *70 that "no exclusion from gross income as a fellowship or scholarship is allowable under Sec. 117." The factual premise of petitioners' argument is thus absent. Our study of the portions of the administrative record on this case indicates that the case was handled in due and ancient form. Petitioners also argue (but did not prove) that other resident physicians claimed exclusions from gross income for their institute salaries and the Service did not deny their claims. On this ground, petitioners claim discrimination. But we have only the facts of petitioners' case before us. The record shows none of the facts with respect to any other resident physician at the institute. Moreover, the facts described in Rev. Rul. 57-370, 1957-2 C.B. 105 and Rev. Rul. 57-560, 1957-2 C.B. 108, cited by petitioners, are clearly distinguishable. Petitioners' claim to an exclusion from gross income must be decided under section 117, and their claim does not meet the requirements of that section. Decision will be entered for respondent.* Footnotes
1. /↩ All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.
2. /↩ Although this contract provision refers to 4 years of residency training plus an additional year of service in a State hospital or other facility, the parties agree that the contract was intended to provide for 3 years of residency training plus the additional year of service.
3. /↩ This exception pertains to individuals who are candidates for degrees and clearly does not apply in the instant case.